UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

*In re*:

SHAYLYNN M. HOVEN,

              Debtor.

Case Number: 22-10605-7

PAUL BURRITT,

              Plaintiff,

     v.

SHAYLYNN M. HOVEN,

              Defendant.

Adversary Number: 22-00035

## DECISION

The question before the Court is whether a debt owed by Debtor-Defendant Shaylynn Hoven ("Hoven") to Plaintiff Paul Burritt ("Burritt") is dischargeable in her bankruptcy. Following discovery and various pretrial matters, a trial was held. For the reasons set forth below, the Court holds that Burritt has not met the burden of establishing all the required elements of his claim by a preponderance of the evidence. So the debt is dischargeable and the Court will dismiss the claims against Hoven.

### JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* ("Code"). 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Code or

arising in or related to cases under the Code. 28 U.S.C. § 1334(b). Discharge is a right that is expressly created by title 11. It would have no existence if not created by the Code. Thus, proceedings on an objection to dischargeability of a debt arise in a case under title 11. *Kontrick v. Ryan*, 540 U.S. 443, 447-48 (2004). District courts may refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Western District of Wisconsin has referred all of its bankruptcy cases to the Bankruptcy Court for the Western District of Wisconsin.

A bankruptcy judge to whom a case has been referred has statutory authority to enter final judgment on any proceeding arising under the Code or arising in a case under the Code. 28 U.S.C. § 157(b)(1). Bankruptcy judges must therefore determine whether a proceeding is a core proceeding or is otherwise related to a case under the Code. 28 U.S.C. § 157(b)(3). As to the former, the bankruptcy court may hear and determine such matters. 28 U.S.C. § 157(b)(1). As to the latter, the bankruptcy court may hear the matters but may not decide them without the consent of the parties. 28 U.S.C. § 157(b)(1), (c).

This is a core proceeding. No party has objected to the Court entering final orders. And as evidenced by the complaint, answer, and joint pretrial statement, the parties agree this is a core proceeding. The Complaint is based on section 523(a)(6) of the Code. This section is a bankruptcy cause of action. Determining the scope of a debtor's discharge is a fundamental part of the bankruptcy process. *See Deitz v. Ford (In re Deitz)*, 469 B.R. 11, 20 (B.A.P. 9th

Cir. 2012). *See also Dragisic v. Boricich (In re Boricich),* 464 B.R. 335, 337

(Bankr. N.D. Ill. 2011).

**BACKGROUND**

A series of dreadful circumstances collided and led to a judgment finding

Hoven liable to Burritt for an untrue story she told when she was 11 years old.

The events that set the story in motion began before Hoven told the untrue tale

to the police.

Hoven had challenges in school. While her IQ shows she is of average

intelligence, she has learning disabilities including dyslexia. She experienced

difficulty in school especially in reading and math. The school district created

an individualized education program (IEP) for her. This included specialized

instruction in math, study skills, and reading. As part of this plan, she received

services and counseling at Impact Counseling Center. Transportation from

school to Impact and then home was provided by a company called Handi-Lift

Transportation, Inc. Hoven did not want to attend Impact.

And problems at home increased the challenges for Hoven. Her parents

were divorced. Her mother remarried. She lived with her mother and

stepfather. She testified she experienced physical abuse in that home and that

a stepbrother had sexually abused her. There is also testimony that her

stepfather may have been abusive. Hoven says abuse led to a diagnosis of post-

traumatic stress disorder.

There was marked animosity between her mother and father and they were not quiet about their dislike of each other. Neither did her father and stepfather get along. Her father encouraged her to complain about her mother.

*This Case.*

This litigation stems from events that occurred more than a decade ago. On November 23, 2011, Burritt was working for Handi-Lift. He was assigned to transport Hoven from Impact in Hayward, Wisconsin, to her home in Birchwood, Wisconsin.

On November 28, Hoven claimed that Burritt sexually assaulted her on this trip. The normal 21-mile trip took about 120 miles to complete and far more time than should have been required.

Burritt disputed the claim. He said he put a wrong address in his GPS unit and got lost. He gave his phone to Hoven to call home and explain she would be late because of this error and the need for gas.

All the same, on December 7 Burritt was arrested based on the accusation. A criminal complaint was filed against Burritt carrying a maximum combined sentence of 85 years.

A reporter was in court on the day of the first appearance in criminal court. So the story of this accusation was publicized locally and in the Milwaukee and Minneapolis markets.

Later the GPS and cell phone data corroborated Burritt's statements he had entered the wrong address. His purchase of gas was also confirmed. The

4

investigation also confirmed he had not been at his home with Hoven and that a phone call was made from his cell phone to Hoven's home.

On January 3, 2012, Hoven was interviewed by authorities for the fourth time.[1] She was read her rights and told that the report she made against Burritt appeared to be false and the interviewer wanted an explanation of why she would have made up the story. At first Hoven denied making a false allegation. Then she said she possibly fell asleep and may have dreamt it. After continued discussion, Hoven said she told the story because she didn't want to go back to Impact and didn't want to get her mother in trouble. She also said she wanted to live with her father and did not want to live with her mother and stepfather. She thought the story might allow her to move in with her father and to stop going to Impact.

The charges against Burritt were dismissed a few days later. Unfortunately, the arrest led to Burritt losing his jobs and incurring costs for a defense attorney and medical expenses. He also had to deal with the internet existence of news reports that he had been charged even though the records also reflected the charges were dismissed. And he suffered from depression and thoughts of suicide.

In 2012, Burritt sued Hoven in state court. She was 12 or 13 at the time. Years passed and, in 2018, a two-day trial was scheduled. Both Burritt and Hoven appeared on the first day. On the second day Hoven did not appear. The court was told she had attempted suicide the night before. Even so, the state

---

[1] ECF No. 24, Exhs. 6, 8, and 9.

court proceeded. Proposed damages were submitted by Burritt's attorney. More time passed and the state court entered a judgment against Hoven. It found that Hoven "failed to answer admissions timely" so the requests were deemed admitted. Based on the deemed admissions, the state court found Hoven liable for "defamation and malicious prosecution."[2] It awarded judgment in the total amount of $732,893.00. The judgment can be broken into these parts:

- Lost income (2011 to 2017)                $108,263.00

- Special Damages                           $  13,540.00[3]

- Noneconomic Damages                       $243,606.00[4]

- Punitive Damages                          $365,409.00[5]

- Costs and attorneys' fees for the
  failure of Hoven to appear on day 2
  of the trial                              $   2,075.00

The record does not explain the noneconomic damages or the basis for an award of punitive damages.

I.   <u>Burden of Proof</u>

A party seeking to establish an exception to discharge of a debt bears the burden of proof. *First Federated Life Ins. Co. v. Martin (In re Martin)*, 698 F.2d 883, 887 (7th Cir. 1983). The United States Supreme Court held that the standard of proof to establish an exception to discharge is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 285 (1991). The party seeking to

---

[2] ECF No. 24, Exhibit 5.
[3] Attorneys' fees in criminal proceeding, medical expenses, moving expenses, and FBI and Internet search fees.
[4] Calculated by multiplying the economic damages by two.
[5] Calculated as the sum of the Lost Income plus the Noneconomic Damages.

except the debt from discharge must prove each of the elements of the discchargeability exception. Exceptions to discharge must be construed strictly against the plaintiff and liberally in favor of the debtor. *Stamat v. Neary*, 635 F.3d 974, 979 (7th Cir. 2011). Although the burden of going forward with the evidence may sometimes shift, the ultimate burden remains with the plaintiff. *Sears, Roebuck & Co. v. Green (In re Green)*, 296 B.R. 173, 179 (Bankr. C.D. Ill. 2003); see also *Penix v. Parra (In re Parra)*, 483 B.R. 752, 774 (Bankr. D.N.M. 2012).

## II.   Res Judicata

Burritt sought to have the state court judgment control the outcome of this adversary under a theory of res judicata or collateral estoppel. If applicable, the doctrines prevent relitigating claims and factual and legal issues that have already been settled in a different court.

But "[r]es judicata does not apply in nondischargeability proceedings." *Hellenbrand Glass, LLC v. Pulvermacher (In re Pulvermacher)*, 567 B.R. 881, 886 (Bankr. W.D. Wis. 2017) (citing *Brown v. Felsen*, 442 U.S. 127, 138–39 (1979)). "Since *Brown*, 'there is a general rule that state court judgments do not have res judicata effect on nondischargeability actions under § 523.'" *Stoughton Lumber Co., Inc. v. Sveum (In re Sveum)*, Nos. 12-15483, 13-00002, 2013 Bankr. LEXIS 2761, 2013 WL 3404097, at *2 (Bankr. W.D. Wis. July 8, 2013) (Slip opinion) (quoting *Voss v. Pujdak (In re Pujdak)*, 462 B.R. 560, 569 (Bankr. D.S.C. 2011)). Questions of whether the debtor acted fraudulently or willfully and maliciously for dischargeability purposes are questions of federal

7

bankruptcy law, not state law. Further, other than a single line of argument, Burritt did not pursue res judicata.

Separately collateral estoppel ("issue preclusion") also operates in bankruptcy to similar effect:

> Although judgments of nonbankruptcy courts on questions of fraud, willfulness, malice, and other issues may not be binding on a bankruptcy court, under certain conditions, debtors will be collaterally estopped from re-litigating in the bankruptcy court factual determinations made in connection with such judgments. Claim preclusion, also known as res judicata, generally refers to the effect of a prior judgment in foreclosing successive litigation on the very same claim, whether or not re-litigation of the claim raises the same issues as the earlier suit. Issue preclusion, or collateral estoppel, refers to the effect of a prior judgment in foreclosing successive litigation on an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or different claim. The party seeking to enjoy the benefits of collateral estoppel has the burden of proving that the elements are satisfied.

ROBERT E. GINSBERG ET AL., GINSBERG & MARTIN ON BANKRUPTCY § 11.07[E][2] (6th ed. 2023).

In short, a nondischargeability action in bankruptcy court really involves two separate elements: (1) liability for a debt, and (2) the dischargeability of that debt. Even though a state court sometimes makes the first determination before a bankruptcy case is filed, the bankruptcy court is empowered to make both determinations if that doesn't occur.

The state court judgment contained none of the findings of fact or conclusions of law necessary to a finding of nondischargeability under section 523(a)(6). The judgment does establish the existence of a debt. But the award

was for defamation and malicious prosecution.[6] Neither claim is identical to the elements required under section 523(a)(6), nor are there any findings that would establish the elements required in bankruptcy court.

So applying claim preclusion is inappropriate. And this is a nondischargeability action confined to whether Hoven incurred a debt by willful and malicious conduct, not whether she committed defamation or malicious prosecution. Finally, no attempt was made by Burritt to argue that any of the elements in the state court claims are the same as those under section 523(a)(6). Thus, neither doctrine applies.

III.    <u>Willful and Malicious Injury Under Section 523(a)(6)</u>

Section 523(a)(6) provides: A discharge under section 727 . . . does not discharge an individual debtor from any debt— for willful and malicious injury by the debtor to another entity or to the property of another entity. To satisfy this exception to discharge, the following are required: (1) an injury caused by the debtor (2) willfully and (3) maliciously. *First Weber Group, Inc. v. Horsfall*, 738 F.3d 767 (7th Cir. 2013). And as in all dischargeability actions under section 523, the burden is on Burritt to prove these elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279 (1991).

Burritt must show "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original). In other words, "willful" means  an

---

[6] *See* ECF No. 24, Ex. 5, Judgment.

intent to cause injury, not simply the commission of an intentional act that
results in injury. *Phlamm v. Mukenschnabl (In re Mukenschnabl)*, 643 B.R. 218,
251 (Bankr. N.D. Ill. 2022).

As explained by the Seventh Circuit in *Horsfall*, "[a]lthough *Geiger* refers
to intentional torts to help explain the federal standard, it does not hold that all
state-law intentional torts are 'willful' for purposes of section 523(a)(6)."
*Horsfall*, 738 F.3d at 774. *See Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 322
(7th Cir. 2012). Negligently or recklessly inflicted injuries do not fall under
section 523(a)(6). *Geiger*, 523 U.S. at 64. So willfulness can be found either if
the "debtor's motive was to inflict the injury, or the debtor's act was
substantially certain to result in injury." *See Horsfall*, 738 F.3d at 774 (citing
*Bukowski v. Patel*, 266 B.R. 838, 844 (E.D. Wis. 2001).

Next, maliciousness requires that the debtor acted "in conscious
disregard of [his] duties or without just cause or excuse; it does not require ill-
will or specific intent to do harm." *Matter of Thirtyacre*, 36 F.3d 697, 700 (7th
Cir. 1994) (citation omitted). The Seventh Circuit in *Jendusa-Nicolai*
summarized the exception to discharge as "one that the injurer inflicted
knowing he had no legal justification and either desiring to inflict the injury or
knowing it was highly likely to result from his act." *Jendusa-Nicolai v. Larsen*,
677 F.3d at 324.

Some cases have touched on willful and malicious injuries involving
minors, but not with a former-minor as a debtor or defendant. *See Armstrong v.
Oslin* (*In re Oslin*), 584 B.R. 363, 372 (Bankr. N.D. Okla. 2018) (collecting

10

cases). In *Armstrong*, for example, a creditor's son was severely injured by an intoxicated minor driver who was served alcohol by the debtor. A state court awarded judgment to the creditor against debtor, but it only established that the debtor and her club were negligent. This did not preclude the creditor from asserting that the debt arose from debtor's willful and malicious conduct for purposes of 11 U.S.C. § 523(a)(6). But the complaint did not seek judgment against the intoxicated minor.

At least one court has held that under the plain language of section 109(e), a minor was an individual with regular income and so eligible to file Chapter 13. *In re Murray*, 199 B.R. 165 (Bankr. M.D. Tenn. 1996) (Lundin, Keith J.). In *Murray*, a chapter 13 debtor was seven years old when the petition was filed. The debtor owned a house that passed to her before the petition date when her father died. She also received social security survivor's benefits.

Looking at the plain language of the Code, the court determined that no provision of the Code requires that a Chapter 13 debtor be an adult. Indeed, a voluntary bankruptcy case is commenced by the filing of a petition "by an *entity* that may be a debtor under such chapter." 11 U.S.C. § 301 (emphasis added). Among the entities that may be a debtor is a "person that resides or has a domicile . . . or property in the United States." 11 U.S.C. § 109(a). For title 11 purposes, "'person' includes individual." 11 U.S.C. § 101(41). An "*individual* with regular income" is eligible for Chapter 13 relief. 11 U.S.C. § 109(e) (emphasis added). In conclusion, the court reasoned that the plain

11

language of the Code does not contain or suggest age exceptions to the ordinary meaning of "individual."

Thus, if a minor can file bankruptcy and be a debtor, then exceptions to discharge likewise apply. The language of the Code contains no age restrictions for filing bankruptcy. In turn, no age restriction is stated in section 523.

The standard for willful and malicious injury is the same that would be applied to adult debtors. A willful and malicious injury is "one that the injurer inflicted knowing he had no legal justification and either desiring to inflict the injury or knowing it was highly likely to result from his act." *Jendusa-Nicolai v. Larsen*, 677 F.3d at 324.

Hoven knew the difference between right and wrong. She understood her duty was to tell the truth. She did not do so. She knew her story was not true but she told it and repeated it anyway. Her actions were willful.

From the record and evidence admitted at trial, it's clear that Hoven lied to the police and investigators several times. It's also clear she knew that lying was bad as shown in the record by Hoven's forensic interview with Sarah Ross,[7] and explained by Burritt's expert witness, Dr. Thompson.

That does not mean her actions were malicious. The evidence before the Court does not establish she knew that her allegations would result in injury to Burritt.

---

[7] ECF No. 24, Ex. 9. ("Asked [Defendant] if she can agree to only tell us the truth today and she agreed. Asked [Defendant] if there are consequences to lying and she said yes and gave appropriate examples.").

Dr. Thompson stated that the material he reviewed in preparation for his opinion included evidence that Hoven had alleged abuse against her stepfather. He also said he understood Hoven's mother and stepfather then separated. This event informed Thompson's opinion of the situation.[8] Still, Dr. Thompson conceded Hoven may not have known the extent of any consequences. But, based on Thompson's belief it was the abuse allegation that led to the separation, he assumed she understood that there would be implications for Burritt.[9] Dr. Thompson then explained his recollection that the police reports[10] and forensic interview[11] reflected that her mother and stepfather separated because of statements she made.[12] However, Dr. Thompson also acknowledged he could not say for certain why Hoven's mother and stepfather separated, only that Hoven alleged abuse and there was a separation.

While Hoven agreed that for some unspecified period her stepfather had stayed at a second home he owned, she also confirmed he was constantly at the house where she lived. Her stepfather never got in trouble for hitting her.[13] He continued to be constantly in her life.[14]

---

[8] Direct Examination of Dr. Thompson at 10:21:10.

[9] *Id.* at 10:48:47.

[10] ECF No. 24, Ex.'s 6, 7, 8.

[11] *Id.*, Ex. 9.

[12] *Id.* at 10:50:09.

[13] Defendant's Testimony at 1:46:06. ([Atty. Christianson:] "Did [Todd Schultz] get in trouble for [physical abuse]?" [Defendant:] "He never got in trouble for anything that he ever did to me.").

[14] *Id.* at 2:01:00.

Likewise, there's evidence in the police reports that Hoven was sexually abused by her stepbrother. And Hoven testified that there were never any consequences for him either.[15]

Based on the evidence before the Court, what should Hoven have expected to occur after her allegations against Burritt? Dr. Thompson explained that she knew there could be consequences, but the kind and degree were not clear.

Consequences are different from an injury. For instance, after she told her mom that her stepfather was abusive, he may simply have moved into another house that he owned but was still constantly involved in her life. Nothing in the record explains the reason for the separation. It would be mere speculation to assume the allegation was the reason.

It doesn't appear that there was any injury to or consequence for the stepfather. No formal action was ever taken either. No police report, no investigation, and no arrest. And he continued to be constantly in her life. The same is true for her stepbrother.

Based on her experience, it's possible Hoven thought that no consequences or injury would result from her allegations but that she was hopeful she could 1) move to live with her father, 2) might be assigned to a different driver, or 3) wouldn't have to go back to Impact. These facts and

---

[15] ECF No. 24, Ex. 6, p. 1; Defendant's Testimony at 2:05:50. ([Atty Whitley:] "In some of these police reports, your mother suggests that you were sexually abused by your brother?" [Defendant:] "That is correct." [Q:] "Were there any significant consequences to your brother?" [A:] "No, there was never a consequence to my brother.").

circumstances do not paint a picture of malicious conduct. Burritt did not show a deliberate or intentional injury. Hoven may have lied but it is unclear whether, at age 11 and based on her prior experience, she knew that her actions would lead to any injury to anyone.

The burden is on Burritt to show that Hoven intended to inflict injury or knew that it was highly likely to result. *Horsfall*, 738 F.3d at 774–75; *Garner*, 498 U.S. at 297. Burritt has not met that burden.

IV.    <u>Damages</u>

Because Burritt failed to meet his burden of proving Hoven's actions were malicious, the claim of nondischargeability fails. As a result, he is not entitled to a declaration that the damages awarded by the state court are excepted from Hoven's discharge.

Nevertheless, a brief discussion of the damages sought is appropriate. Burritt asks that the Court simply accept the total amount awarded by the state court as the amount of any nondischargeable debt. Burritt's theory seemed to be issue preclusion. This argument was not pursued at trial.

Res judicata and Rooker-Feldman are inappropriate in the context of damages, as is issue preclusion. Issue preclusion consists of two steps. First, a court must determine whether the issue or fact was actually litigated and determined in the prior proceeding by a valid judgment in a previous action and whether that determination was essential to the judgment. Second, a court must determine whether applying issue preclusion squares with principles of

fundamental fairness. *In re Jaynes*, 377 B.R. 880, 884 (Bankr. W.D. Wis. 2007).

The state court granted summary judgment to Burritt for defamation and malicious prosecution. It then held a two-day trial on damages. Hoven did not appear on the second day because she attempted suicide on the night of the first day of trial. Yet the court proceeded with the hearing on damages and then waited eight months before entering the judgment.

While the judgment itemizes lost wages and special damages, there is no explanation of the facts supporting or the basis for either the noneconomic damages or punitive damages. The court simply applied multipliers. Just as important is that the elements of the state court claims do not appear to require both willful *and* malicious conduct as defined in the Code.

Courts may award punitive damages if they determine that it will serve the dual purposes of punishment and deterrence. It is the nature of the wrongdoer's conduct, not that of the underlying tort, that must be analyzed. *Shopko Stores, Inc. v. Kujak*, 147 Wis. 2d 589, 600-602, 433 N.W.2d 618 (Wis. Ct. App. 1988). In deciding whether it is necessary to award punitive damages, a court may consider several factors: the age of the offender, the attitude and conduct of the offender upon detection, fines and forfeitures already imposed, and whether the defendant is a person of modest means who will be severely punished by punitive damages. *Id.* Nothing in the record demonstrates that the court considered any of these factors.

16

The state court doubled the lost wages and special damages without explanation or findings to arrive at a noneconomic damage amount. Then it calculated another multiple for punitive damages, vaguely supported by "lying to mother, school officials, Hayward police, and Deputy Ditlefson, and refusal to attend second day of court."[16] No explanation of how this would serve the purpose of deterrence or punishment was mentioned. There is no factual basis or support in the record for these punitive damages.

The state court damages are not entitled to issue preclusion. First, it's unclear whether the issue of damages was "actually litigated" considering that Hoven did not show up for the second day of trial because of a suicide attempt. Second, principles of fundamental fairness do not support upholding the entire state court judgment as nondischargeable. The state court did not cite any factual, statutory, or caselaw basis that warranted twice doubling Burritt's damage award. Without citing concrete factual bases or evidentiary support, it would go against principles of fundamental fairness to uphold the punitive damages award as preclusive. Hoven was 11 at the time of the incident. Within six weeks, she admitted the allegation was untrue and the reasons were to live with her father and stop attending Impact. She was and is also a person of extremely modest means who would be severely punished by such an award.

---

[16] ECF No. 24, Ex. 5, p. 4.

## CONCLUSION

To be clear, the Court's decision is based on the evidence admitted at trial. In the abstract, Hoven's actions were grievous. Without question, Burritt suffered extreme damage to his character and reputation. The Court is mindful of the toll that Burritt has had to bear since Hoven's false allegations were made against him. That said, based on the admissible evidence and the nondischargeability provisions under the Code, Hoven is entitled to a discharge.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order consistent with this decision will be entered.

Dated:  April 11, 2023

BY THE COURT:

_____
Hon. Catherine J. Furay
U.S. Bankruptcy Judge